UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRENDAN E. FILLAR,

        Plaintiff,

                                 File No.  4:05-CV-111

v.

                                 HON. ROBERT HOLMES BELL

UNUM PROVIDENT CORPORATION,

        Defendant.

_____/

## O P I N I O N

Plaintiff Brendan E. Fillar ("Fillar"), sued Defendant UNUM Provident Corporation ("UNUM"), under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461, seeking review of UNUM's denial of long-term disability benefits for the period between February 20, 2003, and May 7, 2004.  Fillar has filed a motion entitled "Motion to Reverse Defendant's Arbitrary and Capricious ERISA Determination and Grant Long-Term Disability Benefits."  As revealed by the title of the motion, Fillar contends that UNUM improperly denied his disability benefits claim.  For the reasons that follow, the Court denies Fillar's motion and affirms UNUM's decision to deny benefits for the period of February 20, 2003 to May 7, 2004.

I.

Until February 19, 2003, Fillar was the chief executive officer of Telecom, Inc., a telephone call center in San Francisco, California.  On that date, he sold his interest in the

company due to repeated bouts with various unexplained illnesses.  Fillar then relocated to Michigan to be near his family and to seek further treatment for his sickness.  Through his employment with Telecom, he was covered by a long-term disability insurance policy issued by UNUM to the company.  The policy provided Fillar with monthly disability benefits if he was "not able to perform the substantial and material duties of [his] occupation" or, after two years of disability, if he was unable "to engage in any gainful occupation in which [he] might reasonably be expected to engage because of education, training or experience."  The policy also contained a provision excluding coverage for any loss caused by a mental disorder, including "but not limited to psychotic, emotional or behavioral disorders, or disorders relatable to stress or to substance abuse or dependency."

In August 2004, Fillar filed a claim with UNUM seeking disability benefits as of February 19, 2003.  According to his application for benefits, Fillar's treating physician, Dr. Michael Ledtke, diagnosed him with Lyme Disease and Chronic Fatigue Syndrome.  Dr. Ledtke also indicated that Fillar had been unable to work since February 19, 2003, although Dr. Ledtke did not start treating Fillar until May 7, 2004.  Dr. Ledtke did not identify any restrictions or limitations placed upon Fillar.  Although Fillar's claim was filed well after the time period set forth in the policy, after receiving Fillar's written explanation for the late notice, UNUM processed his claim.[1]  In order to process the claim, UNUM

---

[1]The policy provides that written notice of claim must be given within 20 days after a covered loss starts or as soon as reasonably possible.

requested additional documentation. Specifically, UNUM explained that "[i]n order to consider benefits prior to May 7, 2004 we will need certification from a physician whose care you were under at that time as well as supporting medical documentation." UNUM also requested Fillar's medical records from Dr. Ledtke. UNUM received medical records from Dr. Ledtke, as well as Dr. Thomas Flynn, an infectious disease physician, Dr. William Webb, a gastroenterologist, Dr. Anthony Gauthier, a urologist, Dr. David Doan, an endocrinologist, Dr. Michael Hogan, an internist, Dr. Keith Rasmussen, a psychiatrist, Dr. Jerrod Falk, a gastroenterologist, Dr. Sheena Kong, an internist, Dr. Jane Melnick, a gastroenterologist, and Dr. John Kreiger, a urologist. The records detailed Fillar's medical treatment from approximately 1996 to 2004.

In November 2004, a registered nurse and UNUM clinical consultant, Patricia Clermont, reviewed the medical records provided by Fillar's physicians. Nurse Clermont indicated that Fillar had undergone several neurological tests "including an MRI, electrodiagnostic, and cerebral spinal fluid testing" that each proved to be negative. She also noted that Dr. Ledtke had administered an "IgG and IgM western blot test" used to diagnose Lyme disease. While Clermont acknowledged that Dr. Ledtke indicated that the test was positive for Lyme disease, she noted that "it does not appear that the test results . . . meet the criteria of the Center for Disease Control to reach this diagnosis." But she deferred any conclusion on Lyme disease to a doctoral consultant. She also noted that while an individual with Lyme disease may experience similar symptoms to those experienced by Fillar, the

3

symptoms "are subjective and self-limiting conditions and the extent to which they are functionally limiting, if at all, cannot be assumed." Nurse Clermont also indicated that based upon an evaluation of Fillar at the Mayo Clinic, he was thought to be depressed and anxious, but had not sought further treatment for these conditions. Ultimately, she concluded that while Fillar had experienced a multitude of symptoms, a majority did not possess an objective medical explanation. She also indicated that it was not clear to her whether he was suffering from a psychological condition but that psychiatric analysis of his file "may be helpful."

Thereafter, an UNUM medical consultant, Dr. Leonard Morse, reviewed Fillar's medical records and Nurse Clermont's analysis. Dr. Morse noted Fillar's wide variety of symptoms and "intense medical care" with many different medical specialists. Dr. Morse also indicated that "[t]he nature of his symptoms and their associations suggest to me that a significant anxiety component is playing a role in the Insured's current incapacitation," and that "[t]he description of his limitations seem exaggerated." With regard to the chronic fatigue syndrome and Lyme disease diagnosis, Dr. Morse explained, "I have reservations concerning the potential side effects from long term antibiotic treatment for suspected chronic fatigue syndrome in a person in whom the diagnosis of Lyme D. is uncertain. Further concern evolves around the long term effect of chronic incapacitation in a young person." Dr. Morse recommended that Fillar's file be referred for a neuropsychiatric opinion

4

and a vocational rehabilitation opinion and that he undergo an infectious disease independent medical examination ("IME").[2]

In a letter dated December 28, 2004, UNUM updated Fillar on the status of its review, reporting Clermont's observation that his symptoms did not appear to have an objective medical explanation and Dr. Morse's conclusion that the symptoms suggested a significant anxiety component. UNUM also requested that Fillar submit to an infectious disease IME in order for UNUM to obtain additional clarification of Fillar's medical status. UNUM also explained that it was unable to consider Fillar's claim for benefits back to February 19, 2003, due to the lack of "physician certification or documentation of any restrictions and limitations" dating back to that date. UNUM, however, also indicated that it was willing to consider a disability onset of May 7, 2004 and in "good faith and on an exceptional basis while we continue to evaluate your claim" would provide Fillar with disability benefits for the period between August 5, 2004 and January 5, 2005. UNUM explained that the payment "and any possible future payments, until we advise you otherwise, are being made under Reservation of Rights. This means that the payment cannot be construed as an admission of present or future liability and we reserve our right to enforce any and all provisions of the policy, and to claim repayment of the benefits that were made to you."

---

[2]During a multi-speciality review conducted by UNUM in 2005, Dr. Morse indicated that instead of a neuropsychological review, he intended to recommend a behavioral health review.

Thereafter, UNUM attempted to schedule an infectious disease IME for Fillar. UNUM tried to schedule an IME in Michigan, and in fact did schedule an appointment with an infectious disease physician in East Lansing, however, due to a scheduling conflict, the physician refused to conduct the IME. While UNUM apparently contacted 35 infectious disease physicians in Michigan, none of them were willing to conduct an IME. Following these failed attempts, UNUM asked Fillar if he would be willing to consider traveling out of state for the IME. Fillar refused, explaining that travel often caused his condition to worsen. In light of Fillar's unwillingness to travel, UNUM determined that instead of conducting an IME, it would schedule an independent medical records review by an infectious disease specialist. At that time, Fillar also submitted additional medical records from Drs. Gauthier and Kong regarding his condition. Dr. Kong treated Fillar while he was living in California in late 2002 through early 2003. The additional records filed consisted of a letter from Dr. Kong explaining Fillar's symptoms during her treatment, indicating that the symptoms were disabling, and concluding that his recent Lyme disease diagnosis accounted for many of his previous symptoms. The additional records also included a letter from Dr. Gauthier, a urologist that treated Fillar upon his return to Michigan. Dr. Gauthier indicated that he had been using various treatments on Fillar including antibiotics, prostate massage, and hyperbarics. Dr. Gauthier also indicated that many of the symptoms Fillar was experiencing could be attributed to Lyme disease.

UNUM then engaged Dr. Allan Morrison, an infectious disease specialist, to conduct the independent medical records review. After reviewing Fillar's medical records, Dr. Morrison reported that "to a reasonable degree of medical certainty Mr. Fillar does not fulfill any criteria (subjective nor objective) for a diagnosis of Lyme disease," and that there was no evidence to support any restriction on Fillar's ability to function in a normal fashion. Specifically, Dr. Morrison disputed Dr. Ledtke's diagnosis of Lyme disease, explaining that the results of the western blot test did not fulfill CDC criteria for a diagnosis of Lyme disease. Dr. Morrison also noted that between 2002 and 2004, "there is [no] mention of cutaneous eruption suggesting erythema chronica migrans rash." Additionally, according to Dr. Morrison, "Dr. Ledtke's management of this patient included supervision of Mr. Fillar during a time in which he was utilizing very unsubstantiated mechanisms of therapy including hyperbaric oxygen and sauna treatments." Dr. Morrison also noted that Fillar's "complex regimen of medications," which included several psychoactive drugs, was "extremely atypical therapy by modern standards," and "could absolutely be related to symptoms that could be reversible with discontinuation of those modalities." Finally, Dr. Morrison stated that Fillar may be suffering from an anxiety disorder and suggested that Fillar undergo a mental health evaluation.

After receiving Dr. Morrison's report, UNUM sent it to Nurse Clermont and Dr. Morse for review. Dr. Morse indicated his agreement with Dr. Morrison's conclusions and suggested that "because of the absence of an organic illness, review by an in-house

behavioral health specialist would be helpful."  UNUM also sent Dr. Ledtke a copy of Dr. Morrison's report and requested his comments.  Dr. Ledtke responded, on June 2, 2005, indicating his total disagreement with Dr. Morrison's report.  After questioning Dr. Morrison's qualifications and background in Lyme disease treatment, Dr. Ledtke explained his view that the CDC definition for Lyme disease was being mis-used for diagnosis and disputed Dr. Morrison's observations that Fillar did not have an erythema migrans rash and did not have a positive Western blot test.  Dr. Ledtke also defended his prescription of psychoactive drugs and long term antibiotics and indicated that, while he discussed many of the alternative treatments Fillar engaged in, he had not recommended any of them.

Upon receiving Dr. Ledtke's comments, UNUM, at Dr. Morse's suggestion, forwarded Dr. Ledtke's letter to Dr. Morrison for additional comment.  Dr. Morrison responded explaining that, despite Dr. Ledtke's assertions, he did not find any documentation of an erythema migrans rash and that Fillar did not test positive for Lyme disease.  Dr. Morrison also maintained his view that Dr. Ledtke's treatment was "anything but typical" and that it "is at odds with peer reviewed literature."  Finally, Dr. Morrison reiterated his opinion that Fillar "does not meet criteria for the diagnosis of [Lyme disease] and that alternative diagnoses should be entertained."

On July 1, 2005, UNUM conducted a Management Referral of Fillar's file.  Relying on Dr. Morrison's report, the claims manager concluded that "it appears that benefits are no

longer payable under this claim."  The claims manager also suggested that Fillar's file undergo an "internal psych review."  Thereafter, Fillar provided additional medical documentation dating back to 1992.  UNUM forwarded the records to Dr. Morrison for review.  On August 3, 2005, Dr. Morrison responded, by letter, to the new medical information.  After highlighting certain diagnostic testing performed on Fillar, including a negative test for Lyme disease in 2001, Dr. Morrison explained that the new information did not alter his previous opinions.  The additional medical records were also reviewed by UNUM's consultants, Clermont and Dr. Morse.  Both consultants concluded that the additional documentation did not support impairment between February 19, 2003 and May 7, 2004.  Clermont noted that all of the documentation pre-dated 2003 and Dr. Morse indicated that he agreed with Dr. Morrison's assessment of the additional records.

UNUM then submitted Fillar's file to an internal quality management review.  This review determined that the file did not meet "quality and/or compliance criteria."  The review noted that UNUM concluded that Fillar did not qualify for benefits because of a mental disorder that was excluded from coverage.  Further, it explained that if UNUM wished to "affirmatively state that the insured has a 'mental disorder' . . . we would need a psychiatric review to confirm the presence of such a disorder."  The review also indicated that while Dr. Morrison's review ruled out Lyme disease, it did not address chronic fatigue syndrome and did not address Dr. Ledtke's references to fibromyalgia.

In light of the quality management review, Fillar's file was referred to Dr. Morse to consider chronic fatigue syndrome and fibromyalgia.  On October 11, 2005, Dr. Morse responded that he did "not think the Insured's symptomatology is due to Chronic Fatigue Syndrome or Fibromyalgia or Lyme Disease."  Dr. Morse also suggested that UNUM request an updated physician's statement from Dr. Ledtke.  Dr. Ledtke provided the updated statement and additional medical records on October 19, 2005.  Dr. Morse reviewed Dr. Ledtke's statement and the accompanying records and reported that "[i]n the absence of interval laboratory test results, for review, it is my opinion, the most recent information reported does not support the diagnosis of Lyme disease or chronic fatigue syndrome."  UNUM also referred Fillar's file to another registered nurse, Sandra Comastra, for a behavioral health review.  Nurse Comastra noted that Fillar "had a history of psychiatric treatment prior to obtaining his disability policy," specifically noting treatment with Dr. Kitt in 2001 and Dr. Morrison's opinion that Fillar was undergoing atypical treatment.  Based upon his pursuit of unconventional treatment, history of psychiatric illness, and preoccupation with symptoms that did not have a medical diagnosis, Comastra concluded that "claimant may very well be limited by a psychiatric disorder" and his limitations appeared "related to a psychiatric condition."

Unbeknownst to UNUM, Fillar filed the present suit in this Court on September 30, 2005.  Fillar did not complete service upon UNUM until November 2005.  Fillar alleges that

10

UNUM has arbitrarily and capriciously denied him benefits for the period between February 19, 2003 and May 7, 2004.

II.

A plan administrator's denial of benefits under an ERISA plan is reviewed *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber v. Bruch*, 489 U.S. 101, 115 (1989). Fillar concedes that UNUM was granted discretionary authority. Accordingly, the Court must apply the deferential "arbitrary and capricious" standard. *Evans v. Unumprovident Corp.*, 434 F.3d 866, 875-76 (6th Cir. 2006) (quoting *Killian v. Healthsource Provident Adm'rs, Inc.*, 152 F.3d 514, 520 (6th Cir. 1998)); *Univ. Hosp. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846 (6th Cir. 2000). This standard is the least demanding form of judicial review, and requires that the Court determine whether, in light of the plan's provisions, the plan administrator's decision was rational. *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir. 2003). Put another way, "when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Id*. While the arbitrary and capricious standard is extremely deferential, a court must not merely "rubber stamp the administrator's decision," but must "exercise [its] review powers." *Jones v. Metropolitan Life Ins. Co.*, 385 F.3d 654 (6th Cir. 2004) (citing *McDonald*, 347 F.3d at 661). The fact that UNUM is operating under a potential conflict of interest because it is both the decision-

maker and the payor of disability claims does not alter the standard of review but is a factor in determining whether the decision was arbitrary and capricious. *Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 457 (6th Cir. 2003) (citing *Bruch*, 489 U.S. at 115; *Univ. Hosps.*, 202 F.3d at 847 n. 4).

In the present case, Fillar contends that UNUM acted arbitrarily and capriciously by ignoring objective medical evidence indicating symptoms of Lyme disease and chronic fatigue syndrome and by failing to offer a reasoned explanation for its denial of disability benefits for the period between February 20, 2003 and May 7, 2004. Based upon its review of the evidence in the administrative record, the Court concludes that UNUM's denial of benefits for this period was rational and was based upon a reasoned explanation supported by ample evidence. In denying Fillar's benefits, UNUM principally relied upon a paper file review by Dr. Morrison as well as file reviews by Dr. Morse, and two registered nurses, Claremont and Comastra. On three occasions, Dr. Morrison reviewed Fillar's medical records. Each time, Dr. Morrison explained that Fillar did not meet the criteria for a Lyme disease diagnosis. In his initial file review, Dr. Morrison unequivocally rejected Lyme disease as a diagnosis, "[i]n my medical opinion to a reasonable degree of medical certainty Mr. Fillar does not fulfill any criteria (subjective or objective) for a diagnosis of Lyme Disease." Dr. Morrison thoroughly explained his reasoning for reaching this conclusion, most notably, his evaluation of the results of objective diagnostic testing for Lyme disease. Dr. Morrison also directly responded to the contrary opinion of Dr. Ledtke, explaining his

reasoning for concluding that Dr. Ledtke's diagnosis and treatment were erroneous. Dr. Morrison also concluded that there was no evidence in Fillar's records supporting any restriction on Fillar's ability to function in a normal fashion.

Fillar contends that UNUM's denial of benefits was arbitrary and capricious because it did not consider his claim of chronic fatigue syndrome. Fillar points to UNUM's September 16, 2005, quality management review which states that Dr. Morrison's review ruled out Lyme disease but did not address chronic fatigue syndrome. Fillar contends that through the quality management review, UNUM admitted that the denial of benefits did not account for the chronic fatigue syndrome diagnosis. Fillar's argument is misguided and completely overlooks UNUM's actions after the quality management review. Following the review, UNUM requested that Dr. Morse review Fillar's medical records with respect to both chronic fatigue syndrome and fibromyalgia. Dr. Morse conducted a review and concluded that Fillar's symptoms were not due to either chronic fatigue syndrome, fibromyalgia, or Lyme disease. Dr. Morse, however, also suggested that UNUM obtain updated medical information from Dr. Ledtke. After receiving and reviewing the updated information, Dr. Morse concluded that, absent "interval laboratory test results," the additional medical records did not support Lyme disease or chronic fatigue syndrome. Dr. Morse's review provides a reasoned explanation and directly refutes Fillar's contention that UNUM denied benefits without addressing the chronic fatigue syndrome.

The only evidence in the record Fillar points to in support of his disability based upon Lyme disease and chronic fatigue syndrome is Dr. Ledtke's response to Dr. Morrison's report and the letters from Drs. Kong and Gauthier. Dr. Ledtke's letter simply disagrees with Dr. Morrison's opinion and attempts to defend Ledtke's treatment and diagnosis. It provides little in the way of objective medical evidence supporting a disability. Furthermore, the letters from the two other physicians simply recite various symptoms and express the opinion that Lyme disease and chronic fatigue syndrome may account for the symptoms.

Moreover, the fact that UNUM relied on the medical opinions of Drs. Morrison and Morse, instead of the contrary opinion of Fillar's treating physicians, does not render UNUM's decision arbitrary or capricious. In fact, it does just the opposite. It demonstrates that UNUM's decision was rational. "Generally, when a plan administrator chooses to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious because it would be possible to offer a reasoned explanation, based upon the evidence, for the plan administrator's decision." *McDonald*, 347 F.3d at 169. *See also Birdsell v. United Parcel Serv. of Am.*, 94 F.3d 1130, 1133 (8th Cir. 1996) (holding that plan administrator's decision to deny benefits was not arbitrary or capricious simply because the administrator adopted one of two competing views). Moreover, it is well established that ERISA does not require a plan administrator to accord

14

any deference to a treating physician's conclusions. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833-34 (2003).

The Court recognizes that neither Dr. Morrison or Dr. Morse conducted a physical examination of Fillar and only reviewed his medical records.[3]   Whether a physician has physically examined a claimant is a factor to be considered in determining whether a plan administrator acted arbitrarily and capriciously in relying on the opinion of a non-treating physician. *Kalish v. Liberty Mutual/Liberty Life Assurance Co. of Boston*, 419 F.3d 501 (6th Cir. 2005).   While UNUM's policy gives it the "right to have [an insured] examined as often as is reasonable while a claim is pending," UNUM elected to rely on an independent file

_____

[3]Fillar makes two unsupported allegations regarding Dr. Morrison and his file review. First, Fillar asserts that UNUM did not obtain an IME because "it could not find any doctors in the region that were willing to sully their reputations and fabricate a report that would be used as the basis to deny Fillar's bonafide claim."  Pl.'s Reply at 3.  This blatant accusation finds absolutely no support in the administrative record and the Court disregards it.  Second, Fillar describes Dr. Morrison as a "hired gun."  To the extent that this label is meant to suggest some impropriety on the part of UNUM or lack of impartiality on the part of Dr. Morrison it is rejected.  While a court may view a plan administrator's explanation based upon the opinion of a doctor in its employ with some skepticism, *see Moon v. UNUM Provident Corp.*, 405 F.3d 373, 381-82 (6th Cir. 2005), in this case, Dr. Morrison was not an employee of UNUM.  He was an independent infectious disease specialist retained to conduct an examination of Fillar's medical records.  There is no evidence of improper influence or other impropriety on the part of UNUM with respect to Dr. Morrison's review. Nor is there evidence of bias on the part of Dr. Morrison.  *See Kalish*, 419 F.3d at 507-08 (concluding that plan administrator did not act arbitrarily or capriciously by relying on file review of independent expert where there was no evidence of tampering or improper influence by the administrator and no evidence of bias on the part of the expert); *cf. McDonald*, 347 F.3d at 168 (holding that denial of benefits was arbitrary and capricious when premised upon an independent physician's report whose initial opinion changed after a discussion with the plan administrator).

review after its multiple attempts at scheduling an IME in Michigan failed and Fillar declined to attend an IME out of state.  Fillar's unsupported allegations notwithstanding, he has not pointed to any evidence in the record that leads to the conclusion that UNUM acted arbitrarily and capriciously by relying on the series of file reviews conducted by Dr. Morrison and Dr. Morse.  UNUM's reliance on the file review alone does not require the conclusion that the denial of benefits was improper. *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 296, 295 (6th Cir. 2005) (holding that the decision to conduct a file review rather than a physical exam is a factor to consider under the arbitrary and capricious standard and that a plan administrator's reliance on a file review "does not, standing alone, require the conclusion that [the administrator] acted improperly.").

In *Calvert*, while the court recognized that there was "nothing inherently objectionable about a file review," it concluded that the review conducted by the doctor in that case was inadequate and, therefore, the plan administrator's denial of benefits in reliance upon the opinion was arbitrary and capricious. 409 F.3d at 296-97.  In concluding that the physician's review was inadequate, the court noted that the doctor did not describe the data he reviewed, did not mention certain objective medical tests that were in the record, and did not appear to be aware of certain surgical procedures that plaintiff had undergone. *Id*. at 296.  The physician also did not refer to a functional capacity evaluation indicating that plaintiff was functionally limited and did not address the Social Security Administration disability determination. *Id*.  The court concluded that, in light of the doctor's inadequate review, his

16

conclusions that plaintiff's claims were subjective exaggerations and that there was no objective data supporting any restriction were incredible on their face.  *Id.* at 297. Accordingly, the Court held that the plan administrator acted arbitrarily and capriciously by relying on the inadequate review.  *Id.*

In contrast to the inadequate file review conducted in *Calvert*, Dr. Morrison's report demonstrated a thorough review of Fillar's medical records.  Dr. Morrison set forth the medical records he reviewed in the course of his analysis and detailed the history of treatment and objective testing Fillar had undergone, including multiple negative tests for Lyme disease, and other sicknesses, in 2002 and 2003.  Further, Dr. Morrison specifically addressed Dr. Ledtke's Lyme disease diagnosis and treatment, discussing his view that the "positive" test did not meet CDC criteria for a Lyme disease diagnosis and his view that Fillar did not display a rash, a symptom of Lyme disease, between 2002 and 2004.[4] Dr. Morrison also explained that many of Fillar's symptoms were not consistent with the diagnostic criteria for Lyme disease.  Dr. Morrison also expressed his disagreement with Dr. Ledtke's prescription of certain antibiotics and psychoactive drugs as well as Fillar's use

---

[4]Dr. Ledtke, in his response to Dr. Morrison's report, and Fillar, in this case, dispute Dr. Morrison's conclusion that the medical records did not contain evidence of a rash. However, neither Dr. Ledtke nor Fillar pointed to any objective medical evidence in the record indicating that Fillar had a rash between 2002 and 2004.  In fact, in Fillar's brief, he asserts that he "did have a history of erythema rash, and as a result was later tested for Lyme disease utilizing the Western Blot test, which confirmed Lyme Disease."  Pl.'s Reply at 5. This assertion, however, is not accompanied by a citation to any portion of the administrative record.

of various alternative treatments.  Based upon his review, Dr. Morrison concluded that Fillar did not fulfill any subjective or objective criteria for Lyme disease.  Dr. Morrison also supplemented his report on two subsequent occasions, specifically addressing Dr. Ledtke's disagreement with his opinion as well as reviewing additional medical evidence submitted by Fillar.  Aside from his disagreement with the conclusion, Fillar has not alleged any inadequacy in the file review conducted by Dr. Morrison.  Based upon the record in this case, it is clear that Dr. Morrison conducted a thorough and adequate review and that UNUM did not act arbitrarily and capriciously by relying upon his opinion.[5]

Fillar also repeatedly argues that UNUM acted arbitrarily and capriciously because it denied benefits for the period between February 20, 2003 and May 7, 2004, but paid benefits post-May 7, 2004 "under the same medical records" and "for the very same symptomology." Pl.'s Br. at 11, Pl.'s Reply Br. at 2.  This argument is misguided as well. Fillar ignores the fact that while UNUM did pay disability benefits after May 7, 2004, this payment was done under a reservation of rights as a good faith gesture.  When it notified Fillar that it would pay disability benefits after May 7, 2004, UNUM explicitly stated:

---

[5]By the same token, the multiple file reviews conducted by Dr. Morse were sufficient and provided UNUM with a reasoned basis for concluding that Fillar was not disabled by Lyme disease or chronic fatigue syndrome.  Dr. Morse thoroughly reviewed the medical records provided by Fillar, and, on one occasion requested that Dr. Ledtke provide additional records so that Fillar's file was up-to-date.  Similar to Fillar's treatment of Dr. Morrison's review, he has not offered any evidence of inadequacy in any of the reviews conducted by Dr. Morse.

> At this time, *to be of good faith and on an exceptional basis* while we continue to evaluate your claim, we have issued Total Disability benefits under your policy . . . Please be advised that this payment and any possible future payments, until we advise you otherwise, are being made under Reservation of Rights. *This means that payment cannot be construed as an admission of present or future liability* and we reserve our right to enforce any and all provisions of the policy, and to claim repayment of the benefits that were made to you.

(AR at 554) (emphasis added).  As is plainly clear from UNUM's letter, the benefits Fillar received were not an admission of UNUM's liability and were given as an exception in good faith while UNUM continued to evaluate the disability claim.  Fillar's attempt to convert this good faith action into evidence of arbitrary and capricious behavior or an admission of liability is directly contrary to the record.  The Court will not construe UNUM's provision of benefits under a reservation of rights as any sort of admission of liability.

Finally, Fillar argues that UNUM did not provide a reasoned explanation to support a denial of benefits based on a psychological defect.  Fillar contends that the record indicates that his psychological problems were secondary to his Lyme disease diagnosis.  Further, he argues that none of the medical professionals that UNUM relied on conclusively determined that his symptoms were the result of a mental defect.  At first glance, this argument appears to present a close question.  However, after thoroughly reviewing the record it is clear that UNUM did not act arbitrarily and capriciously to the extent that they relied on a mental defect to deny disability benefits.

The record is not completely clear as to whether UNUM relied on the mental defect exclusion contained in Fillar's policy to deny disability benefits.  Both Dr. Morrison and

Dr. Morse ruled out Lyme disease and chronic fatigue syndrome, the two conditions Fillar relied on in his benefits claim. Neither physician, however, definitively determined that Fillar's condition was caused by a mental defect. The parties have not provided and the Court has not found evidence in the record indicating that UNUM specifically reported to Fillar that his benefits were denied based upon a mental defect. However, there are references in the record to UNUM's reliance upon a mental defect. Specifically, in UNUM's internal quality management review, this statement appears: "We have concluded that the insured does not qualify for benefits under the policy because his condition is the result of a 'mental disorder,' which is excluded from coverage."[6] Further, the quality management review, also suggests that a psychiatric review would be required, "if we want to affirmatively state the insured has a 'mental disorder' excluded from coverage." In addition, in a December 2004 letter to Fillar, UNUM indicated that the nature of Fillar's symptoms suggested a "significant anxiety component." These references indicate that UNUM did, at least in part, rely on a mental defect in denying Fillar's disability benefits.

To the extent that UNUM relied on a mental defect in reaching its decision, it did not act arbitrarily and capriciously. After ruling out Lyme disease and chronic fatigue syndrome, both Dr. Morrison and Dr. Morse suggested that Fillar's condition may be due to a mental defect. Neither doctor, however, had the expertise to conclusively make a psychological

_____

[6]In the July 2005 UNUM management referral, however, it states that based upon Dr. Morrison's conclusion that Fillar did not have Lyme disease, benefits were no longer payable. There is no mention of denying benefits based upon a mental defect.

20

determination.  Thus, both physicians recommended a mental health evaluation.  Consistent with these recommendations, Nurse Comastra, an UNUM behavioral health consultant reviewed the file.  Her review concluded that based upon his ongoing symptoms, atypical treatment, preoccupation with physical symptoms lacking an objective medical diagnosis, and his prior history of psychiatric illnesses, Fillar's condition appeared to be related to a psychiatric condition.  The review also noted that one of Fillar's previous treating physicians, Dr. Kitt, "strongly suggested an anxiety disorder" and indicated that some of Fillar's complaints "rais[ed] the question[] of a more pervasive anxiety disorder or aura."  This analysis, coupled with Dr. Morse and Dr. Morrison's determination that Fillar was not suffering from Lyme disease and chronic fatigue syndrome, provides a reasoned basis for UNUM's decision to deny Fillar's disability benefits based upon a mental defect.  In the absence of objective evidence of a physical illness, UNUM determined that Fillar's difficulties were attributable to a psychological defect.  This conclusion was rational and supported by the evidence in the record.

Fillar completely overlooks the behavioral health review and does not address it. Instead, Fillar relies on a psychological evaluation conducted by Dr. Keith Rasmussen at the Mayo Clinic in 2003.  Dr. Rasmussen determined that Fillar suffered from a "depressive disorder, NOS," and anxiety over his health.  Dr. Rasmussen recommended an antidepressant medication prescription and, in the event the prescription was not effective, "a referral to a local psychiatrist."  In addition, Fillar's treating physician at Mayo, Dr. Hogan, also

diagnosed Fillar with depression, however, he indicated that it was a "situational-reactive depression," not a "chronic endogenous depression."  Fillar argues that Dr. Rasmussen's and Dr. Hogan's conclusions demonstrate that his psychological difficulties were secondary to his Lyme disease.

Fillar's argument is erroneous.  In many ways Dr. Rasmussen and Dr. Hogan's findings support UNUM's conclusion that Fillar's symptoms were related to a mental defect.  Each doctor diagnosed both depression and anxiety.  This is consistent with Nurse Comastra's behavioral health review as well as the observations of Dr. Kitt, a physician that treated Fillar prior to his visit to the Mayo Clinic.  Additionally, while Dr. Rasmussen prescribed medication and a course of treatment, the record does not reveal that Fillar followed these treatment recommendations.  Furthermore, Fillar's argument that his psychological condition was secondary to his Lyme disease diagnosis is undermined by Dr. Morrison's conclusion that Fillar was not suffering from Lyme disease.  As fully set forth above, UNUM did not act arbitrarily and capriciously by relying on Dr. Morrison's file review and conclusions.  Because Fillar did not have Lyme disease or chronic fatigue syndrome, the only remaining condition revealed in the medical records was a psychological or mental condition.

The analysis provided by Dr. Morrison, Dr. Morse, Clermont, and Comastra provided a reasoned basis for UNUM's decision to deny Fillar disability benefits.  UNUM provided a reasoned explanation for its denial of disability benefits which was supported by substantial

evidence.  Accordingly, the Court holds that UNUM did not act arbitrarily and capriciously in denying Fillar's disability benefits claim.

III.

For the foregoing reasons, Fillar's motion is denied and judgment will be entered in favor of UNUM.  An order will be entered consistent with this opinion.


Date:      August 10, 2006            /s/ Robert Holmes Bell
                                      ROBERT HOLMES BELL
                                      CHIEF UNITED STATES DISTRICT JUDGE